## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Stefan Hinds, being first duly sworn, hereby depose and state as follows:

1. I have been a Postal Inspector with the U.S. Postal Inspection Service (USPIS) since February 2020 and am currently assigned to the Washington Division, Richmond, Virginia, Domicile. As a Postal Inspector, I am charged with investigating crimes with a nexus to the U.S. Postal Service ("USPS") or U.S. mail, including but not limited to mail theft, mail fraud, financial fraud, identity theft, robberies and burglaries of postal facilities, assaults and threats on postal employees, investigations of dangerous and prohibited mails, narcotics, and cybercrime. Since January 2023, I have also served as a Special Deputy United States Marshal with the United States Marshals Service assigned to the Capital Area Regional Fugitive Task Force (CARTF) Richmond. Prior to my tenure with the USPIS, I was a Special Agent with the U.S. Department of Treasury Inspector General for Tax Administration for more than two years and served in the Cyber Investigative Cadre there. In connection with these roles, I completed in excess of 400 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia and graduated the Criminal Investigator Training Program and the Special Agent Basic Training, which included training in arrest procedures, applying for and executing search and seizure warrants, and various other criminal laws and procedures. I have also received specialized training from the Federal Bureau of Investigation's Cellular Analysis Survey Team in historical cell site analysis and geospatial mapping and from the National Cyber-Forensics & Training Alliance.

2. In connection with these roles, I have either led or been involved in a wide range of cybercrime, identity theft, and fraud investigations into individual targets and their co-conspirators using computers, other electronic devices, and the Internet unlawfully to access or use other computers or devices and to defraud individual victims and institutions, including banks and the U.S. Government, including via public benefits fraud. Through this training and experience, I have become very familiar with the various methods and means these criminals and their co-conspirators use to execute their often complex and sophisticated schemes, including, for instance, using social media to enable bank fraud "card cracking" schemes. Given the broad scope of my areas of responsibilities with the USPIS and my involvement in CARTF, I have also conducted and participated in investigations related to drug trafficking, firearms, money laundering, and violent crime, including the theft of money and property (belonging both to individuals and the Government) by fraud or force, as well as armed and unarmed assault of government employees. In connection with these duties and investigations, I have sought and executed numerous search and seizure and arrest warrants, including for physical premises, for individuals, for computers and other electronic devices, and for information associated with online accounts and records. I have also engaged in a wide range of other investigative activities, including physical surveillance; debriefing defendants, witnesses, informants, and other individuals with knowledge of the particular criminal scheme; undercover operations; consensual monitoring and recording of conversations; electronic surveillance through the use of pen registers and trap and trace devices; and the handling and maintenance of evidence. Finally, I have testified before federal grand juries and in court in the Eastern District of Virginia.

3. The facts in this Affidavit come from my observations, knowledge, training, and experience, and from information that I have learned, directly or indirectly, from witnesses, records, information from other law enforcement officers, and from my review of documents and other media. Unless otherwise indicated, conversations related herein are described in substance and part rather than verbatim. Likewise, I have not included each and every fact known to me but rather only those necessary to show probable cause to believe that O'SIRUS LANDRES CHARLES FORD, has committed a violation of 18 U.S.C. § 1951 (Interference with Commerce by Robbery) on or about May 9, 2023 in the Eastern District of Virginia.

## PROBABLE CAUSE IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANT

4. In Fiscal Year 2022 (FY22), approximately 412 USPS letter carriers were robbed during the course of their official duties. With 305 incidents reported in the first half of FY23, such incidents are becoming more prevalent. USPS likewise reported an increase in high-volume mail theft incidents from mail receptacles, including blue collection boxes: 38,500 in FY22 and more than 25,000 in the first half of FY23.

5. In 2022 and 2023, USPS has continued to harden the collection box inventory across the country against traditional fishing-related mail theft. While that is making traditional collection box fishing more difficult, USPIS has seen an increase in the theft of "Arrow keys," the master keys used to access the variety of mail repositories, including blue collection boxes, outdoor parcel lockers, and apartment mailbox panels. These keys are sold for thousands of dollars on the black market, as criminals seek to acquire them to facilitate the theft of U.S. Mail in connection with other lucrative criminal schemes, like check fraud and identity theft. Because of their wide-ranging access and related value, the possession, use, and transfer of Arrow keys is highly regulated, leading criminals to steal them from postal workers through actual or threatened violence, to recruit postal employee co-conspirators from whom to lease their Arrow keys, and to purchase them illicitly in criminal marketplaces, e.g. via the Dark Web.

6. In May 2023, USPIS and other law enforcement agencies began the investigation into that eventually resulted in the identification of FORD and co-conspirators and other associates known and unknown to law enforcement in connection with, among other things, the May 9th robbery of a USPS City Carrier (Victim #2) at or about 109 Galax Street in Hampton.

7. Galax Street is very short (<1000' feet long in total) and terminates on the west side into Aberdeen Road and on the east side into Parkinson Road. On the other side of its Aberdeen Road terminus lies the Hampton Post Office (809 Aberdeen Road), which is one of the closest post offices to Suffolk from I-664. 109 Galax sits at the corner of the terminus with Parkinson Road, and on the other side of that street lies Lindsay Middle School (1636 Briarfield Road), a public school that provides elementary education. Given its proximity to this school, all of Galax Street (including 109 Galax) appears to be within 1000 feet of the grounds of a public school and thus within a "school zone" as set forth in 18 U.S.C. §§ 921–22. See below map and photograph for additional context:



8.      As to the Hampton robbery, the interviews and other evidence establish that at approximately 3:20PM on May 9, 2023, Victim #2 was delivering U.S. Mail in the 100 block of Galax Street in Hampton, Virginia, wherein the mailboxes were largely affixed to the sides of the residences. After he delivered the mail to 109 Galax, as he stepped off the front porch of that residence, two black males wearing face masks approached him, with Suspect 1 (S1) approaching him from his right (west) side and Suspect 2 (S2) coming from the roadway on Galax Sreet. S2 brandished a firearm that had been concealed in his sweatshirt, then hid it back there again and stating "Give me your keys, or I'm gonna shoot you." S2 then repeated "Give me all your keys, You have five seconds," before counting down from five and ordering him to rip the keys off his belt. Victim #2 gave S2 his USPS-issued Arrow key. Thereafter, both suspects fled west on Galax Street then turned left on Aberdeen Road and continued fleeing south in the direction of the Westhampton Apartments (651 Aberdeen Road). A witness called 911 at approximately 3:23 p.m.

9.      Victim #2 described S1 as approximately 5'7" tall, weighing approximately 150 lbs., younger than 25, medium-to-light complexion, and wearing a gray sweatshirt, dark "Covid" mask, and dark jeans. He described S2 as being the same approximate weight but taller (5'10", 160 lbs), having darker skin, with hair in braids or twists, and wearing dark clothing, including a dark "stocking cap" and "Covid" mask. Victim #2 was very confident he could identify S2 in a

photographic array, even given the mask, but expressed that he likely wouldn't be able to identify S1, given their limited interaction. Both predictions proved accurate, as, on May 12th, he successfully identified FORD in an array as being the individual who brandished the firearm at him, but then also misidentified one of the unrelated photographs in the array as to S1.

10. A review of DMV records revealed that FORD (as of 1/19/23) was 6'0" tall, weighed 141 pounds, with hair in chin-length braids or dreadlocks that are significantly lighter in color at their ends, while Unindicted Co-Conspirator #1 (UCC1) (as of 11/7/15) was 5'7", weighed 143 pounds, and wearing black glasses, and Unindicted Co-Conspirator #2 (UCC2) (as of 1/6/22) was 5'11" tall and 150 pounds, wearing black glasses and with piercings in both ears.

11. Law enforcement identified the getaway vehicle as a 2006 silver Lexus sedan bearing Virginia license plate UCS-4050 and made contact with its registered owner. He identified the car as being driven by Individual 1, with whom I later spoke in a voluntary interview late in the evening of May 9th and into the morning of May 10th.

12. Significantly, after Individual 1's mom called her upon the police showing up at her house and asking about the car in connection with the robbery of a postal carrier, Individual 1's immediately called UCC2, with whom I also later spoke in a voluntary interview on May 10th. During that call, they discussed responses to law enforcement and information about FORD.

13. Individual 1 and UCC2's accounts of the May 9th events were largely consistent, with each offering different details, but UCC2 also offered other information about the events preceding Individual 1's involvement and about FORD and UCC1, given that they were his friends and that he had known FORD since high school. A summary of their accounts is as follows:

 a. Individual 1 admitted she was driving the silver Lexus in the area of Galax Street at the approximate time of the robbery and that three other individuals were in the car with her: UCC2 and two of his friends, UCC1 and FORD. Earlier in the day, UCC2 had called her and asked if she would take him, UCC1, and FORD "across the water" for "gas money," a reference to the fact that she picked them up at a hotel in Suffolk and crossed Hampton Roads on I-664 to bring them into Hampton. UCC2 sat in the front passenger seat, with FORD behind Individual 1, and UCC1 behind UCC2.

 b. FORD was wearing a gray "hoodie," black pants, and blue "bubble shoes"; UCC1 was wearing glasses, a black t-shirt, and black pants; and UCC2 was wearing a "cap" over his braids and a t-shirt

 c. UCC2 relayed that while they were *en route* to Hampton from Suffolk, FORD took UCC2's phone and began using it to direct Individual 1 where to go. When UCC2 looked at the phone, he saw the address was "postal office." Further, when I observed UCC2's cellphone during the interview, I observed "US Post Office, 405 Chesterfield Road."

 d. After driving around the area for a bit, FORD directed Individual 1 to pull over in the area of a Post Office, saying "let me get out I'm about to go get some mail for my peoples," which UCC2 purported to understand to mean picking up a PPP/unemployment check.

FORD and UCC1 then exited her car onto "a street near the post-office," and she said she and UCC2 stayed in the car and proceeded to the 7-11 convenience store nearby.

e. UCC2 eventually contacted FORD to see where he was, and FORD responded indicating that he was on Industry Drive. Individual 1 said she "[rode] around looking for them," and pulled into an apartment complex where she parked until she finally observed UCC1 and FORD emerging from "in between the building." UCC2 said that it took approximately 7–10 minutes between when they left the car and returned.

14. One area where their accounts diverged materially was about FORD's and UCC1's appearance and demeanor upon their return to the car and about the presence of firearms. Individual 1 said she did not observe any masks and insisted she had no knowledge of anything indicating criminal behavior, including masks, guns, etc. UCC2 said that he saw FORD and UCC1 running toward the vehicle, that they were each taking off black ski masks as they got in, and that FORD appeared nervous. Likewise, UCC2 detailed that he owns a black Glock 23 with a 22-round magazine, which was with him all day, and that UCC1 was also armed but left his firearm in the car when they went on the alleged trip to the Post Office, saying "bro I'm not taking my gun we just going to check the mail we just walking."

15. Officers also interviewed other witnesses at the apartment complex, one of whom described two black males running to the vehicle in question. The first was wearing a dark grey sweater and a black ski mask, which he removed before he got into the car, allowing the witness to see dreads in his hair pulled up on top of his head with red tips. The second subject was wearing a black hoodie and a ski mask and eyeglasses, but he saw the witness looking at him and did not remove his mask before getting into the backseat. Another witness had video footage that showed the car parked with two individuals inside, the driver and a front passenger wearing a white shirt.

16. UCC2 provided additional details about the circumstances leading up to Individual 1's arrival. Earlier that day, FORD had asked him to drive him to pick up a vehicle (which UCC2 described as a red BMW) he had rented for two days using the Turo app in Chesapeake. Upon arrival, though, they (UCC1 was with FORD when UCC2 arrived) discovered that the key was missing, so UCC2 reached out to Individual 1 to get a ride for all of them to get onto the other side of the water because he did not want to drive that far in his car.

17. Though the interviews of both UCC2 and Individual 1 were voluntary and noncustodial (of which they were reminded by agents), they each appeared evasive or to be minimizing their involvement in or knowledge of any illicit activity at times, as detailed above in the section about FORD's and UCC1's appearance when they came back to the car, with her minimizing denial even being undermined by other statements of hers that that they "st[a]nk" (consistent with sweating after the running observed by UCC2) and that she was made so "uneasy" by their return that she abandoned the plan for her to drive FORD home to Chesapeake and just dropped all three off back at the hotel in Suffolk where she had picked them up. Likewise, members of the investigative team have recently received records that indicate UCC2 had more advanced knowledge of, and potentially involvement in, the Hampton robbery than he initially portrayed.

18. FORD's three associates (UCC1, UCC2 and Individual 1) very quickly either deleted information from or locked access to their accounts very shortly after law enforcement first made contact with Individual 1, which she relayed immediately to UCC2, and which he admitted he admitted discussed with UCC1. I know from my knowledge, training, and experience, that such behavior is often evidence of consciousness of guilt, as criminals often delete online accounts that they are worried contain evidence of their crimes.

19. Cell site location information (CSLI) is found in specialized location records that typically contain data for events like calls, texts, and/or data sessions. These records can contain an estimation of the target phone's location (latitude and longitude) with a possible accuracy radius, an accessed cell site/sector, and/or the distance from the cell site at the time of the usage event. Each carrier uses their own nomenclature to describe the technology used to obtain this data including: AT&T's NELOS (Network Event Location System), Verizon Wireless's RTT (Round Trip Time/Return Trip Time/Real Time Tool), Sprint & U.S. Cellular's PCMD (Per Call Measurement Data), and T-Mobile's Timing Advance or TruCall. These specialized location records have significantly less retention time at the carriers than traditional call detail records but were requested promptly here and thus have been invaluable in the investigation, given that it is likely to be an excellent proxy for their physical location, given how often they use their phones.

20. While the CSLI records for FORD, UCC2, and Individual 1 are voluminous and complex, a few examples from a review of those records indicate how they support probable cause here:

  a. The cellphones of Individual 1, UCC2, and FORD all consistently used the cell tower that serviced the area of Aberdeen Road in Hampton around the time of the robbery (Individual 1/UCC2 between approximately 3:21–3:23 p.m. and FORD between approximately 3:20–3:25 on May 9, 2023 (that is: the CSLI corroborated their presence in the area of the Hampton carrier robbery at the time it was occurring);

  b. CSLI from UCC2 and Individual 1's phones also showed them traveling away from the crime scene and back across Hampton Roads via I-664 and the Monitor-Merrimac Memorial Bridge-Tunnel (MMMBT) at approximately 3:25–3:34 p.m., consistent with what they had already told investigators. FORD actually made a call during this period (at approximately 3:28 p.m.), and the related CSLI shows his phone using a cell tower in close proximity to the MMMBT.

21. Of more significance is what FORD was doing *before* the robberies. As a resident of Chesapeake and someone who frequents Norfolk, trips "over the water" using limited points of access and affected by construction and traffic would not usually be spur of the moment or throwaway decisions; witness the effort he had to expend and the number of people he had to enlist to get to Hampton on May 9th. Given this background, it is perhaps even more unusual that CSLI for FORD's phone show him making what appear to be reconnaissance trips the day before each of the robberies, with CSLI for his phone show it using the cell tower that serviced the area of Ballentine Place between 3:00–4:00 p.m. on May 7th, the day before the City Carrier was to be robbed in the same location. Likewise, on May 8th from 1:00-1:15 p.m., CSLI for FORD's phone

shows it using the cell tower that services the Aberdeen Road area of Hampton, again almost exactly 24 hours before a City Carrier would be robbed in the same area.

22. On May 28, 2023, I observed Instagram user siris_si – an account that appeared to be FORD's, based in part on apparent "selfies" he has posted – post an Instagram story (excerpted screenshot below) appearing to show him holding a firearm – with the serial number (893774) clearly displayed – trained on the front of a vehicle while in the rear passenger seat. I was able to identify the firearm as a SCCY CPX1CBPURD reported stolen less than two weeks earlier on May 17, 2023. According to the report, the theft victim had left the firearm in her trunk five days earlier on May 12th, as she dropped the vehicle off at her house in Portsmouth, Virginia, before going to get married and discovered it was gone when she looked in the trunk for it.



23. Based on my conversations with other law enforcement specializing in firearms and interstate nexus determinations, SCCY firearms are not manufactured in the Eastern District of Virginia and would have traveled in or affected interstate and/or foreign commerce

24. I know from my knowledge, training, and experience that the U.S. Mail is a vital part of interstate and foreign commerce, as individuals and businesses use it to send currency or equivalents; to send documents in furtherance of that commerce, like contracts or receipts; and to ship and send items purchased in interstate commerce. I further know, including as set forth herein with respect to the impact of Arrow key thefts and in this particular Hampton robbery, that violence

-8-

upon carriers and the theft of Arrow keys, both actually results in and carries with it the natural and ordinary consequence of obstructing, delaying, or affecting interstate and foreign commerce.

## CONCLUSION

25. Based on the information contained herein, I respectfully submit that probable cause exists to charge O'SIRUS LANDRES CHARLES FORD with committing a violation of 18 U.S.C. § 1951 (Interference with Commerce by Robbery).

_____
Postal Inspector Stefan Hinds
United States Postal Inspection Service

This affidavit has been reviewed for legal sufficiency by Assistant U.S. Attorney Julie Podlesni.

Reviewed: _____
Julie Podlesni
Assistant United States Attorney

Subscribed and sworn before me on June ___5___, 2023, in the City of Norfolk, Virginia.

_____
UNITED STATES MAGISTRATE JUDGE