IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

UNITED STATES OF AMERICA,

v.

JAYDEN STUKES,

    Defendant.

Criminal No. 4:23-cr-51

**POSITION OF THE UNITED STATES ON SENTENCING**

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Julie D. Podlesni, Assistant United States Attorney, hereby submits its position with respect to the sentencing factors outlined in the United States Sentencing Guidelines (USSG) and in 18 U.S.C. § 3553. The United States has reviewed the Presentence Investigation Report (PSR), as modified, and neither objects to it nor moves for a departure or variance. ECF Nos. 83, 86. The United States does not intend to offer expert testimony at sentencing.

For the reasons to follow, as well as those to be offered during the sentencing hearing, the United States respectfully requests that the Court impose a total sentence of 54 months' imprisonment followed by three years of supervised release and any restitution. While the Court should credit his early acceptance of responsibility, and the defendant will likely emphasize the fact that he was not the actual gunman, it should also take into account that his involvement was not only knowing – and critical to its success – but eager and much more extensive than originally claimed. A sentence at the lower end of the guidelines – which are already

low to account for his minimal criminal history and should not be lowered further on that basis – is appropriate when considering all of the factors under Section 3553(a).

## PROCEDURAL AND FACTUAL HISTORY

On August 14, 2023, a federal grand jury sitting in the Eastern District of Virginia returned a ten-count Superseding Indictment adding the defendant and co-defendant Watson to the previously charged co-defendant Ford with crimes related to the armed robbery of a postal carrier for a USPS-issued "arrow" key and related firearms offenses, both as principals and as aiders and abettors. Defendant made his initial appearance on the related summons on August 30, 2023. ECF Nos. 22, 29–35. On December 15, 2023, the defendant appeared before the Honorable Douglas E. Miller, United States Magistrate Judge, and pleaded guilty to Count One, charging Interference with Commerce by Robbery, in violation of 18 U.S.C. §§ 1951 and 2, in accordance with the Plea Agreement [ECF No. 69] and a very detailed Statement of Facts [ECF No. 70]. His plea was accepted by this Court pursuant to its January 2, 2024, order, and sentencing was scheduled for April 17, 2024. ECF Nos. 71–72, 80. The disclosed PSR was issued on March 12, 2024, and the parties met and conferred and to discuss the outstanding defense objection – the United States having made no objections – as noted in the final PSR [ECF No. 86], filed March 29, 2024.

## STANDARDS GOVERNING SENTENCING

In fashioning a criminal sentence, a district court must "first calculate the applicable Guidelines range." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). After calculating the guidelines range, the district court "must give both the

government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) and "make an individualized assessment" based on the facts in the PSR or otherwise presented by the parties to determine whether those § 3553(a) factors support a party's requested sentence. *Id.* and *Gall*, 552 U.S. at 49–50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50). This is because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," and thus the Court "must give serious consideration to the extent of any departure from the Guidelines," and, where applicable, explain why "an unusually lenient or an unusually harsh sentence" outside those Guidelines is appropriate. *Gall*, 552 U.S. at 46. Thus, the Court must "address the parties' nonfrivolous arguments in favor of a particular sentence" in sufficient detail to allow for "meaningful appellate review.," *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017). In doing so, though, the Court need not separately address every specific supporting claim but rather should focus the parties' arguments as a whole and address their "central thes[e]s." *United States v. Powers*, 40 F.4th 129, 137 (4th Cir. 2022) (quoting *United States v. Nance*, 957 F.3d 204, 214–215 (4th Cir. 2020)).

The scope of the facts and evidence the Court should consider at sentencing is broad and flexible, given that the goal of the sentencing procedures is to bring all the information concerning a defendant's background, character, and conduct *without limitation* so that the Court may fashion an appropriate sentence. *United States v. Falesbork*, 5 F.3d 715, 722 (4th Cir. 1993). *See also, Williams v. New York*, 337 U.S. 241, 247 (1949) (holding that it is "highly relevant–if not essential–to [the] selection of an appropriate sentence" for the court to have "the fullest information possible concerning the defendant's life and characteristics.")). 18 U.S.C. § 3661 is clear that "no limitation shall be placed on the information concerning the [Defendant's] background, character, and conduct . . . which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus the conduct under consideration includes not only prior convictions but also acquitted or uncharged conduct. *See United States v. Watts*, 519 U.S. 148, 154 (1997) (acquitted conduct); *Witte v. United States*, 515 U.S. 389, 399–401 (1995) (uncharged conduct); *United States v. Davis*, 918 F.3d 397, 404–06 (4th Cir. 2019); *United States v. Jinwright*, 683 F.3d 471, 484–85 (4th Cir. 2012).

Moreover, courts should exercise this "wide latitude" in what facts and evidence to consider "without regard to its admissibility under the rules of evidence applicable at trial." *United States v. Seay*, 553 F.3d 732, 741–42 (4th Cir. 2009). Thus such evidence routinely includes summary items like police reports but also uncorroborated hearsay and "reliable but illegally-obtained evidence." *See United States v. Love*, 134 F.3d 595, 607 (4th Cir. 1998); *United States v. Mondragon,* 860

F.3d 227, 233 (4th Cir. 2017); *United States v. Nichols*, 438 F.3d 437, 440–41, 44–45 (4th Cir. 2006) (finding reversible error where the district court refused to consider substance of properly suppressed statements); U.S.S.G. § 6A1.3 "Commentary."

Therefore, where parties object to findings in a presentence report, their "mere objection" is not sufficient. *Love*, 134 F.3d at 606, quoting *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). Rather, the objecting party has "an affirmative duty to make a showing that the information in the presentence report is unreliable, and [to] articulate the reasons why the facts contained therein are untrue or inaccurate." *Terry*, 916 F.2d at 162 (*citing United States v. Mueller*, 902 F.2d 336, 346 (5th Cir. 1990) (finding that the defendant presented no evidence in rebuttal to the PSR)); *see also United States v. Randall*, 171 F.3d 195, 211 (4th Cir. 1990). Without an affirmative showing that the PSR is inaccurate, the Court can "adopt the findings of the [PSR] without more specific inquiry or explanation." *Terry*, 916 F.2d at 162 (quoting *Mueller*, 902 F.2d at 346).

Sentencing findings – including contested facts, relevant conduct, and aggravating or mitigating factors – must be found by a preponderance of the evidence, with the objecting party bearing the burden to establish inaccuracy or unreliability, the United States bearing the burden on enhancements, and the defendant bearing the burden on reductions. *See United States v. Steffen,* 741 F.3d 411, 414 (4th Cir. 2013); *see also Mondragon,* 860 F.3d at 233 (quoting *Terry*, 916 F.2d at 162 (4th Cir. 1990)).*United States v. Urrego-Linares*, 879 F.2d 1234, 1239–40 (4th Cir. 1989). The preponderance standard "requires only that the existence of a fact be more probable

than its nonexistence." *United States v. Doctor,* 958 F.3d 226, 234 (4th Cir. 2020) (quoting *United States v. Padgett,* 788 F.3d 370, 374 (4th Cir. 2015)). The reliability standard is likewise not strict, requiring only that "evidence relied upon must have some minimal indicium of reliability beyond mere allegation." *United States v. Hicks*, 948 F.2d 877, 883 (4th Cir. 1991) (internal citations and punctuation omitted).

## POSITION ON SENTENCING AND ARGUMENT

While all the § 3553(a) factors bear upon the appropriate sentence here, the nature of the offense is the most serious but also includes the defendant's role and the need for deterrence (both specific and general) and to protect the public, all of which stand out as significant factors justifying the requested overall sentence of 54 months.

As to the instant circumstances, the Statement of Facts and PSR do an excellent job of recounting the relevant facts. But the record reveals far more information that may help the Court, given the nature of the offense and Defendant's history. Therefore, at sentencing, the United States intends to introduce excerpts and other records relating to the defendant's communications with the gunman, co-defendant Ford, to convey to the Court fully Defendant's involvement.

In the PSR, the U.S. Probation Office detailed not only the facts relating to the offenses of conviction but also to Defendant's history and characteristics, and the United States agrees with its calculations. The defendant was assigned a total offense level of 24 on Count One after properly crediting his acceptance of responsibility. PSR ¶¶ 21–39, 63. The United States Probation Office also correctly scored Defendant's

lack of criminal history, resulting in a Criminal History Category of I, and yielding an overall advisory Guidelines range of 51–63 months. The requested sentence is appropriately at the low end of the guidelines, which balances the gravity of the offense with his minimal criminal history.

The nature and circumstances of this crime, particularly as to the defendant's involvement, are alarming. First, the appalling goal they pursued so casually: **_robbing a mail carrier faithfully serving the public, in the course of carrying out his duty_**, which is particularly disturbing given aggravating factors like the traumatic impact on the victim – who was on his **_first_** day on that route – and the shocked elderly witnesses. Moreover, as the Court has repeatedly seen, introducing firearms into any situation is dangerous, but doing so in the kinds of circumstances – brazen daytime robberies in populous areas – amplifies that volatility and threat, making even benign situations even more unstable and extremely dangerous, and doing so extremely quickly, volatility that can result in the death of the victim carrier, bystanders, or the perpetrators themselves.

Moreover, the nature of the defendant's involvement should deepen the Court's concern. As set forth in the Statement of Facts, the defendant helped Ford in multiple ways, starting with getting transportation across the water, **_with full knowledge that he intended to commit an armed robbery_**. The defendant had multiple opportunities to reconsider, but at every turn, he recommitted himself to the robbery.

First, he brought along Watson – his "twin" who was a "lock" because they were "into sum [S**t]" – who aided Ford in the actual commission of the robbery. And far

-7-

from this being the product of coercion or a case of naïfs led astray, all three (Ford, Stukes, and Watson) were armed with firearms, contributing to the aforementioned volatility, and all three had masks that covered their full faces, which, as used by Watson and Ford here, delayed apprehension and understanding of the full scope of the case, also resulting in the time, space, and notice to destroy evidence.

Next, he helped arrange the transportation, saving the entire scheme when it would have otherwise fallen apart before it had even gotten close to succeeding. When Ford, Stukes, and Watson met at the rental car that Ford had used in the Norfolk robbery the preceding day and was going to use for the Hampton robbery, they discovered they could not drive it. Stukes did not reconsider and desist, but instead enlisted a close friend, K.H., to drive them across the water for $50, which Ford paid to her via another's CashApp account, also paying the defendant for his assistance.

Even on the way over, Ford used the defendant to inform K.H. (to a limited extent) and directed them to an address that was a Post Office, before driving around the nearby neighborhood in a circuitous and searching fashion. Again, the defendant did not demur but kept advancing towards the armed robbery of that carrier.

But most chilling are the messages between the defendant and his co-conspirators, only some of which were able to be reviewed, and the contrast they stand to the defendant's portrayal of himself an oblivious innocent. While the defendant initially claimed that he had no real involvement in nor advance knowledge of the nature of Ford's activities, their messages at the time make clear that he was helping Ford to actually hunt down the victim carrier.

The defendant should be credited for his lack of a criminal history and the fact that he was not the actual gunman, but a sentence at the lower end of the guidelines range does so adequately, as the advisory guidelines range, particularly after the 2023 amendments, already amply accounts for those mitigating circumstances.

But Section 3553(a) also requires that we account for the gravity of the offense and the need for deterrence, which are of paramount importance here. The Complaint, Superseding Indictment, and Statement of Facts in this case set forth in detail the alarming trend of these robberies, which spread like wildfire and hit the Peninsula particularly hard in Fiscal Year 2023, with this area having some of the highest per capita rates in the nation. And while generalized data about deterrence and sentencing may be inconclusive, these robberies have received increasing attention, including the very robberies charged in this case, elevating the role deterrence should play. *See, e.g.*, Kavanagh, Margaret, "Chesapeake man admits hunting down and robbing 2 postal carriers in Hampton and Norfolk over 2 days," accessed online March 22, 2024, at https://www.wtkr.com/investigations/chesapeake-man-admits-hunting-down-and-robbing-2-postal-carriers-in-hampton-and-norfolk-over-2-days. Time and again in these cases, including in this very case, agents see co-conspirators and their associates discussing publicity surrounding these robberies and related schemes, often adjusting their behavior accordingly.

Recent months have seen a marked reduction in the numbers of armed robberies of carriers in this area, with none in this Division since early fall 2023, which is also shortly after these apprehensions and the full scope of the crime became

public via the Superseding Indictment. Of course, no one event or circumstance – including that one – can be credited for any such (preliminary) outcome, particularly given the limited sample size and the interrelationship with that rate and the incentives, or lack thereof, to commit these crimes elsewhere, including, increasingly, Richmond. *See, e.g.*, Moore, Madison, "Two Richmond USPS mail carriers robbed at gunpoint in just five days," accessed via https://www.wric.com/news/local-news/richmond/two-richmond-usps-mail-carriers-robbed-at-gunpoint-in-just-five-days online on April 4, 2024.

But there is likewise no question that these arrow key armed robberies are closely followed by not only the media but also by both the victim-public and the criminal perpetrators, as noted herein. In such circumstances, general deterrence takes on additional significance here and must be carefully addressed, as a below-Guidelines sentence would signal to the would-be-robbers that the significant anticipated remuneration (both for the key itself and in the financial fraud schemes from the related mail theft) should be weighed against a relatively low penalty for even eregious crimes like these, *i.e.* crimes of violence against public employees targeted precisely because of, and during the performance of, their work in service to the public.

Finally, in considering both general deterrence and the overall gravity of the offense itself, the Court should keep in mind not only the direct victims like the mail carriers but also he more remotely related victims: the thousands of innocent citizens and businesses who have not only their money but often their identities stolen as a

direct result of these robberies. Here, starting with a sentence within the guidelines range established by a formula that already incorporates these many factors in arriving at that overall offense level these factors appropriately reflects the seriousness of the offense. But then using any mitigating circumstances to arrive at a sentence at the lower end of that range – which range has likewise already been lowered to reflect those circumstances – also likewise appropriately accounts for factors related to the defendant's lack of criminal history or role in the offense while not losing the deterrent import.

## CONCLUSION

The requested sentence, which is significant but within the advisory guidelines range and not greater than necessary, respects those very (granular) calculations and uses them to help balance properly the Section 3553(a) factors that are most important here (the gravity of the offense conduct, the harm it produced, and the need for general deterrence), while also accounting proportionally and equably for mitigating factors, such as his lack of a criminal history. Further, by issuing a sentence within, but at the low end of, the resulting range, the Court respects appropriately the goals and policy statements outlined in those very Guidelines, which themselves already bake those factors into the calculations by harnessing using that very granularity. Finally, as noted, because deterrence plays such a critical role in both ethe instant matter and in cases with similar key facts or methods, the Court must keep that need front-of-mind in issuing the final sentence.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:        */s/*
Julie D. Podlesni
Assistant United States Attorney
Virginia State Bar No. 77198
Office of the United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
Tel. (757) 591-4000 | Fax (757) 591-0866
Julie.Podlesni@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of April, 2024, I filed a copy of the foregoing with the Clerk of Court via CM/ECF, which will send a notification to counsel.

*/s/*
Julie D. Podlesni
Assistant United States Attorney